IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

OCT -6 2010

COURT OF APPEALS
DIVISION TWO

IN RE PINAL COUNTY MENTAL
HEALTH NO. MH-201000029

)
)
)
)
)
)

2 CA-MH 2010-0001
DEPARTMENT B

O P I N I O N

APPEAL FROM THE SUPERIOR COURT OF PINAL COUNTY

Honorable Craig A. Raymond, Judge Pro Tempore

VACATED

James P. Walsh, Pinal County Attorney
  By Craig Cameron                                              Florence
                                                Attorneys for Appellee

Mary Wisdom, Pinal County Public Defender
  By Lisa M. Surhio                                             Florence
                                                Attorneys for Appellant

E C K E R S T R O M, Judge.

**¶1**          After a hearing on a petition for court-ordered treatment, the trial court found by clear and convincing evidence that appellant is persistently and acutely disabled as a result of a mental disorder and is either unable or unwilling to accept treatment voluntarily. Pursuant to A.R.S. § 36-540(A)(2), the court ordered that appellant receive inpatient and outpatient treatment for not more than 365 days, including no more than 180 days of inpatient treatment. Appellant contends there was insufficient evidence to

support the order because neither of the two psychiatrists who examined him conducted an in-person, physical examination as required by A.R.S. §§ 36-533(B) and 36-539(B). For the reasons set forth below, we vacate the order.

**Factual and Procedural Background**

¶2 The appellant was examined by two psychiatrists, Dr. Michael Vines and Dr. Vincent Krasevic. Dr. Vines was in the same room as appellant when he observed and interviewed him. In Vines's affidavit, under the heading "Mental Status" and the subheading "Emotional process," he reported that appellant walked with a limp, had "a history of spina bifida," made good eye contact, appeared relaxed, and wore long hair and a beard. Vines did not testify he had conducted any other bodily examination of the appellant, nor did he suggest appellant's behavior or condition made such an examination impracticable.

¶3 Dr. Krasevic examined appellant remotely by a "Telemed" video conferencing system rather than in person. Krasevic indicated both in his affidavit and testimony that he had reviewed available documentation on appellant, including a drug screen and a report of his vital signs taken by a nurse practitioner. Like Dr. Vines, Dr. Krasevic's observations of appellant's physical appearance and behavior were focused on his mental status.

¶4 Appellant contended below that Dr. Krasevic had not conducted a physical examination and that the state had therefore "failed to meet the strict requirement . . . under the mental health statutes that two physicians actually perform examinations and

evaluations of the patient." The trial court found the state had met its burden and the evidence presented was sufficient to conclude appellant was persistently and acutely disabled as a result of a mental disorder.

**Discussion**

¶5 "The requirements of . . . most of the provisions of Title 36 . . . are set forth with precision and clarity. When the legislature has spoken with such explicit direction, our duty is clear." *In re Coconino County Mental Health No. MH 95-0074*, 186 Ariz. 138, 139, 920 P.2d 18, 19 (App. 1996). Because a person's involuntary commitment "may result in a serious deprivation of liberty," strict compliance with the applicable statutes is required. *In re Coconino County Mental Health No. MH 1425*, 181 Ariz. 290, 293, 889 P.2d 1088, 1091 (1995). A lack of strict compliance "renders the proceedings void." *In re Burchett*, 23 Ariz. App. 11, 13, 530 P.3d 368, 370 (1975).

¶6 The issues raised in this appeal involve questions of statutory interpretation, which are questions of law that we review de novo. *In re MH 2006-000749*, 214 Ariz. 318, ¶ 13, 152 P.3d 1201, 1204 (App. 2007). When interpreting a statute, our primary purpose is to give effect to the intent of the legislature. *In re Maricopa County Mental Health No. MH 2001-001139*, 203 Ariz. 351, ¶ 12, 54 P.3d 380, 382 (App. 2002). The "best evidence of that intent" is the plain language of the statute. *Id*. If the language of a statute is not clear, we "determine legislative intent by reading the statute as a whole, giving meaningful operation to all of its provisions, and by considering factors such as the statute's context, subject matter, historical background, effects and consequences, and

3

spirit and purpose." *Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996).

¶7 Before a petition for court-ordered treatment may be filed, the proposed patient must first be evaluated. A.R.S. § 36-533(B). An evaluation is "a professional multidisciplinary analysis based on data describing the person's identity, biography and medical, psychological and social conditions" performed by a group of health care professionals, including "[t]wo licensed physicians, who shall be qualified psychiatrists, if possible . . . and who shall examine and report their findings independently." A.R.S. § 36-501(12). Section 36-533(B) provides, *inter alia*, that the petition for court-ordered treatment

> shall be accompanied by the affidavits of the two physicians who conducted the examinations during the evaluation period . . . [which affidavits] shall describe in detail the behavior which indicates that the person, as a result of [a] mental disorder, is . . . persistently or acutely disabled . . . *and shall be based upon the physician's examination of the patient* and the physician's study of information about the patient.

(Emphasis added.) Absent a stipulation, the two physicians who execute the affidavits must testify at the hearing on the petition "as to their personal examination of the patient." A.R.S. § 36-539(B). "Examination" is defined as "an exploration of the person's past psychiatric history and of the circumstances leading up to the person's presentation, a psychiatric exploration of the person's present mental condition and a *complete physical examination*." § 36-501(14) (emphasis added). Together, §§ 36-533(B) and 36-501(14) require that two physicians must each personally conduct a

4

"complete physical examination" of the patient. *See In re MH 2008-000438*, 220 Ariz. 277, ¶¶ 14, 16, 205 P.3d 1124, 1127 (App. 2009).

¶8        In this case, the parties dispute the meaning of the phrase "complete physical examination" and therefore reach different conclusions about the nature and scope of that examination. The appellant asserts the phrase contemplates a conventional physical examination like that conducted by any physician to evaluate a patient's overall medical health. The state counters that, in the context of a psychiatric evaluation, the legislature intended to require only "observations of a proposed patient, [his or her] demeanor, presentation, ability to communicate with the doctor, and expressions." In short, the state suggests a physician may comply with the requirement by conducting a remote visual observation of the patient, evaluating his or her presentation only for signs of mental illness.

¶9        In our view, a plain reading of the pertinent statutory language compels the conclusion that the legislature intended to require a physical examination directed at evaluating the patient's overall medical health. As discussed above, § 36-533(B) unambiguously requires that two physicians participate in the "evaluation" of the patient. Section 36-501(12) clarifies that the required "evaluation," of which a "complete physical examination" is a component, includes an analysis not only of the patient's "psychological" condition but also his or her "medical" condition. Thus, the legislature's stated goals for the broader evaluation suggest it intended the physical examination to encompass both the medical and psychological aspects of a patient's health.

5

¶10        Moreover, § 36-501(12) specifies that the examination—including the "complete physical examination"—must be conducted not by psychologists, but rather by "licensed physicians, who shall be qualified psychiatrists, if possible." Thus, the statute expressly requires that the person conducting the complete physical examination have medical training in addition to some background in evaluating mental illness. This further suggests that the "complete physical examination" contemplated by the legislature be one directed at the overall medical status of the subject.

¶11        Nor can we harmonize the state's suggestion that the examination may be a limited one, confined to a visual assessment of the patient's presentation, with the legislature's requirement that the physical examination be "complete." *See City of Phoenix v. Phoenix Employment Relations Bd.*, 207 Ariz. 337, ¶ 11, 86 P.3d 917, 920-21 (App. 2004) ("Courts . . . give meaning to each word, phrase, clause, and sentence so that no part of the statute will be void, inert, redundant, or trivial."). And the state offers no other textual support for its narrow interpretation of what the "complete physical examination" must entail.

¶12        To the contrary, the legislative history of the current statute demonstrates that the requirement of a "complete physical examination" was first introduced as part of a comprehensive legislative scheme designed in part to protect the severely mentally ill from medical neglect. Previous versions of our code also required an "examination" or "personal examination" by physicians prior to a civil commitment. Ariz. Rev. Code 1928, § 1769; Ariz. Code 1939, § 8-301; Ariz. Code 1939, § 8-307 (Supp. 1952); A.R.S. § 36-507(B) (1956); 1958 Ariz. Sess. Laws, ch. 84, § 1 (former A.R.S. § 36-514(B)). But

6

these examinations were apparently limited in scope and related only to the mental health of the patient. *See* 1958 Ariz. Sess. Laws, ch. 84, § 1 (allowing court to make orders "necessary to provide for examination into the mental health of the person" under former A.R.S. § 36-510(A)); *cf.* Ariz. Rev. Code 1928, § 1772 (requiring "an examination into the alleged insanity" of incarcerated person by physician as prerequisite to commitment in state hospital).

¶13        This changed in 1974, when the legislature repealed our prior mental health statutes, 1974 Ariz. Sess. Laws, ch. 185, § 1, and for the first time required a "complete physical examination" of persons being evaluated for treatment. 1974 Ariz. Sess. Laws, ch. 185, § 2 (former A.R.S. § 36-501(10)). The new law implemented a package of reforms aimed at clarifying and enforcing patients' rights,[1] preventing involuntary psychosurgeries,[2] and generally protecting patients from abuse and medical neglect.[3] As part of these reforms, the legislature guaranteed that a person undergoing an evaluation would receive both "*physical* and psychiatric care and treatment for the full period he is detained." 1974 Ariz. Sess. Laws, ch. 185, § 2 (former A.R.S. § 36-518(A)) (emphasis added). The same provision guaranteeing quality treatment also directed agencies to keep records detailing "all *medical* and psychiatric evaluations and all care and treatment received by the person." 1974 Ariz. Sess. Laws, ch. 185, § 2 (former § 36-518(A))

---

[1]*See* 1974 Ariz. Sess. Laws, ch. 185, § 2 (former A.R.S. §§ 36-511 through 36-523).

[2]*See* 1974 Ariz. Sess. Laws, ch. 185, § 2 (former A.R.S. § 36-562(E)).

[3]*See* 1974 Ariz. Sess. Laws, ch. 185, § 2 (former A.R.S. § 36-524).

(emphasis added). It further required the agency responsible for the person's care and treatment to provide, *inter alia*, "[a] full physical examination once a year." 1974 Ariz. Sess. Laws, ch. 185, § 2 (former § 36-518(B)(3)).

¶14 Thus, the history and context of Arizona's statutory scheme reinforce our conclusion that the plain language of § 36-501(14) requires a physical examination directed at the physical as well as the mental health of the patient. In requiring complete physical examinations, our legislature demonstrated it was concerned not only with the mental conditions of people being evaluated but also with other medical conditions that might require attention while they were in state custody. And, by requiring separate physical examinations under §§ 36-533(B) and 36-539(B), the legislature ensured that examining physicians would not uncritically adopt each other's conclusions, *see In re Commitment of Alleged Mentally Disordered Person*, 181 Ariz. 290, 292, 889 P.2d 1088, 1090 (1995); *MH 2008-000438*, 220 Ariz. 277, ¶ 16, 205 P.3d at 1127, but would instead carefully examine each proposed patient, document his or her condition, and determine that the patient's problems were truly the "result of [a] mental disorder" rather than a separate medical condition. § 36-533(B).

¶15 Our understanding of the legislature's intent in requiring a "complete physical examination" conforms both to a layperson's and a physician's understanding of what that phrase means. A "physical examination" is generally defined as "an examination of the bodily functions and condition of an individual." *Webster's Third*

8

*New Int'l Dictionary* 1706 (1971).[4]  A "physical examination," specifically, is "[t]he act or process of examining the body to determine the presence or absence of disease." *Taber's Cyclopedic Medical Dictionary* E-69 (12th ed. 1973).  Traditionally, the "four procedures utilized are inspection, palpation, percussion and auscultation." *Id.*[5]  And our statute's use of the word "complete" is consistent with the medical caveat that the "physical examination should proceed *a capite ad calcem* (from head to foot)" and assess the patient's various bodily systems using various diagnostic techniques.  Mahlon H. Delp, *Study of the Patient*, *in* Major's Physical Diagnosis 13, 20 (Mahlon H. Delp & Robert T. Manning eds., 7th ed. 1968).[6]  In short, the traditional components of a

---

[4]In the absence of a statutory definition, a dictionary may be consulted to determine the ordinary meaning of words used in a statute.  *See Jennings v. Woods*, 194 Ariz. 314, ¶¶ 42-43, 982 P.2d 274, 283 (1999); *State v. Wise*, 137 Ariz. 468, 470 n.3, 671 P.2d 909, 911 n.3 (1983).  Technical words and phrases, however, are to be construed according to their own "peculiar and appropriate meaning."  A.R.S. § 1-213.  Similarly, we will accord words a special meaning when their context makes it apparent such a meaning was intended.  *See Trustmark Ins. Co. v. Bank One*, 202 Ariz. 535, ¶ 27, 48 P.3d 485, 491 (App. 2002); *State v. Martinez*, 202 Ariz. 507, ¶ 15, 47 P.3d 1145, 1148 (App. 2002); *Wells Fargo Credit Corp. v. Tolliver*, 183 Ariz. 343, 345, 903 P.2d 1101, 1103 (App. 1995).  Here, because there is no discrepancy between the ordinary and medical definitions of a "physical examination," our references include both.

[5]We have confined our citations to dictionaries predating the legislation.  We note, however, that contemporary definitions of the term are not meaningfully different.  *See Dorland's Illustrated Medical Dictionary* 664 (31st ed. 2007) (defining "physical examination" as "examination of the bodily state of a patient by ordinary physical means, as inspection, palpation, percussion, and auscultation"); *Taber's Cyclopedic Medical Dictionary* 1665 (20th ed. 2001) (defining "physical examination" as "[e]xamination of the body by auscultation, palpation, percussion, inspection, and olfaction").

[6]In identifying the traditional components of a physical examination in this opinion, we do not purport to articulate those components of a "complete" physical exam required by § 36-501(14)—components that our legislature did not specify and that would logically be left to the sound discretion of a trained physician in conformity with evolving medical standards.  Indeed, relevant medical literature suggests that the

physical, which involve a true hands-on assessment of the medical condition of the patient, demonstrate that, at minimum, a "complete physical examination" involves more than an interview and visual assessment of a patient's presentation and demeanor.

¶16 The state contends the legislature intended the phrase "complete physical examination" to convey a more specialized and limited meaning in the specific context of a statute setting forth the requirements for a psychiatric evaluation of a patient's potential mental disorders. However, the state has not explained what the particular specialized meaning would be or how it would differ from lay and medical understandings of a physical examination.

¶17 Our own perusal of psychiatric literature does not support the state's suggestion that a physical examination conducted as part of a psychiatric evaluation would be fundamentally different in nature and more limited than an ordinary physical. Indeed, the physical examination has long been utilized in psychiatry to determine a patient's "medical status" and to detect "underlying, and perhaps unsuspected, organic pathology that might be primarily responsible for the psychiatric symptoms." Marc H. Hollender & Charles E. Wells, *Medical Assessment in Psychiatric Practice*, *in* 1 Comprehensive Textbook of Psychiatry 776, 776 (Alfred M. Freedman, Harold I. Kaplan

---

appropriate scope of a physical examination, and therefore its completeness, depends on the particular medical status of the individual patient. *See* Philip Solomon & John B. Sturrock, *The Psychiatric Examination*, *in* Handbook of Psychiatry 26, 26 (Philip Solomon & Vernon D. Patch eds., 3d ed. 1974) (observing "there is no standard physical examination"); *see also* Am. Psychiatric Ass'n, *Practice Guideline for Psychiatric Evaluation of Adults*, *in* Practice Guidelines § III.K, at 17 (1st ed. 1996) ("Additional items may be added to the [physical] examination to address specific diagnostic concerns or to screen a member of a clinical population at risk for a specific disease.").

& Benjamin J. Sadock eds., 2d ed. 1975). Today, the physical examination is still viewed by the American Psychiatric Association (APA) as necessary to evaluate the patient's "general medical status" in order to "1) properly assess the patient's psychiatric symptoms and their potential cause, 2) determine the patient's need for general medical care, and 3) choose among psychiatric treatments that can be affected by the patient's general medical status." Am. Psychiatric Ass'n, *Practice Guideline for the Psychiatric Evaluation of Adults*, *in* Practice Guidelines for the Treatment of Psychiatric Disorders: Compendium 2006 § III.K, at 22, § IV.A.5, at 36 (2d ed. 2006); *see also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 181-190 (4th ed. text revision 2000) (listing mental disorders due to general medical conditions).[7] Although nothing in our statute suggests that our legislature intended to adopt any particular specialized definition for a "physical examination," much less those promulgated in any specific psychiatric text, it is noteworthy that even those texts advise a physical examination similar to the type described in more general medical literature. *See* Am. Psychiatric Ass'n, *Practice Guideline for the Psychiatric Evaluation of Adults*, *in* Practice Guidelines for the Treatment of Psychiatric Disorders: Compendium 2006 § III.K, at 22-23 (2d ed. 2006) (recommending physical examination include collection of patient's vital signs; examination of head, neck, heart, lungs, abdomen, and extremities; check of patient's neurological status; and inspection of skin, "with special attention to any stigmata of trauma, self-injury, or drug use").

---

[7]Our supreme court has recognized the Diagnostic and Statistical Manual of Mental Disorders promulgated by the APA as an authoritative text in the field of psychiatry. *See Logerquist v. McVey*, 196 Ariz. 470, 474 n.2, 1 P.3d 113, 117 n.2 (2000).

11

**¶18** The state contends the examinations performed here were nonetheless adequate in light of *MH 2008-000438*. There, Division One of this court reaffirmed that each of the two evaluating physicians must personally conduct the required examination, including the physical examination, to comply with § 36-533(B). *MH 2008-000438*, 220 Ariz. 277, ¶¶ 7-8, 11, 13-14, 18, 205 P.3d at 1126-27. In so holding, the court observed in a footnote: "In this context a physical exam is not the typical annual physical but a component of a psychiatric examination, which includes observing the patient's demeanor and physical presentation, and can aid in diagnosis." *Id.* n.3.[8] The state identifies this comment as support for its contention that the "complete physical examination" mandated in § 36-501(14) may be limited to observations of the patient's demeanor and presentation and focused exclusively on a mental health diagnosis.

**¶19** But the question of what constitutes a "complete physical examination" was neither squarely before the court in *MH 2008-000438* nor essential to the court's disposition. It was therefore, at best, obiter dicta, carrying limited precedential weight. *See Phelps Dodge Corp. v. Ariz. Dep't of Water Res.*, 211 Ariz. 146, n.9, 118 P.3d 1110, 1116 n.9 (App. 2005) (defining different types of dicta). We decline the state's invitation to construe that case as approving the limited and remote diagnostic methods utilized here, contrary to the plain language of our statutes. In fact, as to the issues it squarely

---

[8]Division One of this court recently repeated this statement without analysis in broadly describing the features of a required evaluation. *In re MH2009-002120*, 225 Ariz. 284, ¶ 5, 237 P.3d 637, 640 (App. 2010).

addressed, *MH 2008-000438* applied a standard of strict compliance with the statutory requirements, much as we do here. *See* 220 Ariz. 277, ¶ 7, 205 P.3d at 1126.

¶20 Even were we to agree that it is burdensome and unnecessary to require complete physical examinations when evaluating the mental health of a proposed patient, this court is not free to amend the unambiguous language of our statutes to conform to our own notions of public policy.[9] *See State v. Gonzalez*, 216 Ariz. 11, ¶ 10, 162 P.3d 650, 653 (App. 2007); *State ex rel. Dep't of Econ. Sec. v. McEvoy*, 191 Ariz. 350, ¶ 16, 955 P.2d 988, 991 (App. 1998). And, although we express no opinion on the reliability of the conclusions reached by the psychiatrists in this case concerning the appellant's mental status, we are neither inclined nor empowered to deny individual patients the medical benefits and protections bestowed on them by our legislature.

¶21 The statutory scheme requires each of two physicians to personally conduct a physical examination of a patient. *See* §§ 36-501(14), 36-533(B), 36-539(B). Here, the record is unambiguous that Dr. Krasevic failed to do so.[10] His only examination of appellant occurred remotely by a "Telemed" video conferencing system rather than in

---

[9]We are aware that our legislature recently expanded the role nurse practitioners may play in the evaluation process. *See* 2010 Ariz. Sess. Laws, ch. 272, §§ 1, 4-5. But in so doing, the legislature left essentially unchanged the provisions of our mental health code we address today. Thus, each evaluating psychiatrist or qualified physician must still personally perform a complete physical examination of the proposed patient. *See* §§ 36-501(14), 36-533(B), 36-539(B). Should the legislature conclude the expense or inefficiency of the examination requirement outweighs its benefits, the legislature is free to amend these statutes and specify otherwise.

[10]The record suggests Dr. Vines also failed to conduct a complete physical examination, as the appellant contends on appeal. However, the appellant made no such contention to the trial court and we therefore do not address the adequacy of that examination further.

13

person. Although he relied on a written report of appellant's vital signs previously taken by a nurse practitioner, he did not conduct a complete physical examination himself. And Krasevic's observations related exclusively to appellant's alleged mental disorder rather than his overall health. Therefore, Krasevic did not personally conduct the physical examination called for by our legislature as a necessary basis of his opinion.[11]

¶22		Because the procedures specified by our mental health statutes were not strictly complied with by at least one of the two physicians who examined the appellant, we must vacate the court's treatment order. *See Commitment of Alleged Mentally Disordered Person*, 181 Ariz. at 293, 889 P.2d at 1091.

## Concurrence

¶23		Turning briefly to our colleague's concurring opinion, we respectfully disagree that our decision today contains any unnecessary dicta on the scope of a physical examination.[12] While we share her desire to generate decisions no broader than the issues asserted in the trial court and framed by the parties on appeal, we believe the

---

[11]We do not address whether a complete physical examination conducted by medical personnel at the contemporaneous direction of a physician using a video conferencing system would comply with the statute. The record is clear no such procedure was employed here.

[12]Although our opinion makes reference to scholarly understandings of a "physical examination" which itemize its traditional components, we include those descriptions only to illustrate the general nature of the exam contemplated by our legislature when it used that phrase—not to give any specific scholarly understanding the force of law. In suggesting we have purported to determine the precise scope of a complete physical exam based on these texts, we fear our colleague misunderstands the nature of our reference to them.

limited opinion she advocates would neither meet that criteria nor fully meet the responsibilities of this court.

¶24     We have a duty to affirm a trial court on any proper ground, a duty that is especially pronounced when, as here, the trial court has not set forth the specific basis for its disputed ruling. *See City of Phoenix v. Geyler*, 144 Ariz. 323, 330, 697 P.2d 1073, 1080 (1985) (recognizing appellate court's obligation to affirm where any reasonable view of facts and law might support trial court's judgment); *Murren v. Murren*, 191 Ariz. 335, ¶ 8, 955 P.2d 973, 975 (App. 1998) (stating appellate court "'must affirm if there is any proper basis to do so'"), *quoting Crye v. Edwards*, 178 Ariz. 327, 328, 873 P.2d 665, 666 (App. 1993). Under such circumstances, we cannot leave unaddressed the state's primary argument in support of that ruling: that the "complete physical examination" called for by the statute requires nothing more than a visual assessment of the patient's presentation and demeanor. Notably, Dr. Krasevic's remote examination provided him the opportunity to visually inspect the patient and would therefore comply with the requirement of a "complete physical examination" under the state's mistaken understanding of that phrase.

¶25     Nor could we dispose of the state's argument on grounds that it is too frivolous to merit discussion. To the contrary, as discussed, the state's argument finds support in the footnote of a recent opinion of our court, a footnote we assume the trial court had read and was arguably required to follow. *See Fuentes v. Fuentes*, 209 Ariz. 51, ¶ 32, 97 P.3d 876, 883 (App. 2004) (trial courts presumed to know law and correctly apply it).

15

## Disposition

¶26        For the foregoing reasons, the treatment order is vacated.

/s/ *Peter J. Eckerstrom*
PETER J. ECKERSTROM, Judge

CONCURRING:

/s/ *Garye L. Vásquez*
GARYE L. VÁSQUEZ, Presiding Judge

K E L L Y, Judge, concurring.

¶27        I write to concur in the only holding reached by my colleagues—that the trial court's order for treatment is void for failure to comply strictly with the commitment statutes. Because the opinion's discussion of what a complete physical examination entails is not necessary to our decision, and because this issue was neither raised in the trial court nor adequately developed on appeal, I would not engage in the lengthy interpretation of the statute undertaken by my colleagues.

¶28        In their opinion, my colleagues conclude that Dr. Krasevic's evaluation of appellant, conducted remotely and in reliance on an evaluation previously performed by a nurse practitioner, failed to comply strictly with the statutory requirements. I agree with this conclusion which, in itself, disposes of the matter before us. Having decided that Krasevic's examination fell short of the statutory requirements because his observations were limited to appellant's mental disorder rather than to his overall health, we need go

16

no further in explaining what more the statute might require.  To do so is to engage in unnecessary dicta.  *See Creach v. Angulo*, 186 Ariz. 548, 551-52, 925 P.2d 689, 692-93 (App. 1996) ("A court's statement on a question not necessarily involved in the case before it is dictum."); *see also McCluskey v. Indus. Comm'n*, 80 Ariz. 255, 258, 296 P.2d 443, 445 (1956) ("It would be dicta for us to make any pronouncement on matters unnecessary to a determination of the instant review.").

¶29        Furthermore, engaging in a discussion of extraneous matters is particularly ill-advised due to the meager record before us.  Appellant made no argument to the trial court relating to the necessary scope of the physical exam, but instead argued only that Krasevic had conducted his examination remotely.  After the state had presented its case below, appellant's counsel moved for a directed verdict based on A.R.S. § 36-539(B), stating, "Petitioner must present the testimony of two physicians who performed examinations in the evaluation of the patient."  Counsel then referred to the definition of examination contained within A.R.S. § 36-501(14), and argued that "one of the doctors was not even present with [appellant] in the room, so it is not possible that he actually conducted a physical examination."  The trial court rejected that argument.  At the close of the evidence, appellant again argued that the state had not met its burden, citing the requirement that the evaluation include a physical examination.  Specifically, counsel stated:  "That examination . . . requires a physical examination and that was not conducted by Dr. Krasevic."

¶30        On appeal, appellant argues that the trial court erred in finding the state had met its burden because Krasevic had never been in the same room as appellant and

17

therefore could not have conducted a physical examination. Appellant also asserts for the first time on appeal that "neither doctor performed the required complete physical examination." Generally, when a party fails to raise an issue before the trial court, the issue is waived on appeal. *Reid v. Reid*, 222 Ariz. 204, ¶ 16, 213 P.3d 353, 357 (App. 2009). And, although it is true that when extraordinary circumstances exist, we may address matters raised for the first time on appeal,[13] *Trantor v. Fredrikson*, 179 Ariz. 299, 300, 878 P.2d 657, 658 (1994), the appellant also failed to develop the argument adequately on appeal. *See* Ariz. R. Civ. App. P. 13(a)(6); *Polanco v. Indus. Comm'n*, 214 Ariz. 489, n.2, 154 P.3d 391, 393-94 n.2 (App. 2007) (failure to develop and support argument waives issue on appeal). Likewise, although the state cites *In re MH 2008-000438*, 220 Ariz. 277, 205 P.3d 1124 (App. 2009), in support of its argument that an examination "like one would expect during one[']s annual physical examination" is unnecessary under the statute, it fails to develop any argument about the scope of the physical examination.

---

[13]"Given the liberty interests at stake," an involuntary treatment case can "present[] one of 'the extraordinary circumstances' in which an error not presented to the trial court may be presented to an appellate court in the first instance." *In re MH 2006-000023*, 214 Ariz. 246, ¶ 11, 150 P.3d 1267, 1270 (App. 2007) (vacating involuntary treatment order because patient not provided timely notice as required by A.R.S. § 36-536, and statute specifically prohibited waiver of such notice). However, in this case, appellant's failure to raise this issue below not only denied the trial court and opposing counsel "'the opportunity to correct any asserted defects,'" *id.* ¶ 8, *quoting Trantor*, 179 Ariz. at 300, 878 P.2d at 658, but leaves this court without an adequate record upon which to base any decision concerning the scope of a complete physical examination. And, unlike the situation presented in *MH 2006-000023*, no statute that specifically bars waiver is implicated here.

¶31        My colleagues have undertaken the task of determining the scope of a complete physical examination in the context of a psychiatric evaluation for commitment, even though the issue was not raised below or developed adequately on appeal, relying on their "own perusal of psychiatric literature."[14]  Given the parties' failure to support their arguments with any evidentiary material, this is an exercise in which I will not, and respectfully suggest my colleagues should not, engage.  Therefore, although I concur in the judgment, I write separately because I cannot agree with substantial portions of my colleagues' opinion.

/s/ *Virginia C. Kelly*
VIRGINIA C. KELLY, Judge

---

[14]Neither my colleagues, nor the treatises upon which they rely, address whether a physical examination in the commitment context is necessarily different from physical examinations in other contexts.